UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| ROBERT FORD,<br><br>              Movant,<br><br>     vs.<br><br>UNITED STATES OF AMERICA,<br><br>              Respondent. | 4:15-CV-04152-KES<br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

This matter is before the court on Robert Ford's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  Respondent, the United States of America ("government") has moved to dismiss the motion for failure to state a claim.  See Docket No. 22.  Mr. Ford resists the motion.  See Docket Nos. 26 & 27.  This matter has been referred to this magistrate judge for a recommended disposition pursuant to the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge, and 28 U.S.C. § 636(b)(1)(B).

**FACTS**

Mr. Ford advances a single argument in support of his motion.  He argues his trial counsel was ineffective in investigating facts to be used for cross-examining the complaining witness in his case, Christina Weston, and in

failing to properly use those facts to cross-examine Ms. Weston at trial.  See Docket Nos. 1 & 5.

## A.      Pretrial Proceedings

Mr. Ford was charged in a two-count indictment alleging he sexually abused Ms. Weston while she was incapacitated and that he kidnapped her, both alleged to have occurred on June 30, 2011.  See United States v. Ford, 4:11-cr-40116-KES, Docket No. 1 (D.S.D. Dec. 6, 2011) (hereinafter "CR"). Attorney Stacey Kooistra was appointed to represent Mr. Ford on December 20, 2011.  See CR Docket Entry following Docket No. 11.  Mr. Kooistra remained as Mr. Ford's counsel through his jury trial.

During the pendency of the case, Mr. Kooistra sought a court-appointed investigator as well as a court-appointed pharmacology expert.  See CR Docket Nos. 23 & 24.  Both requests were granted.  See CR Docket Nos. 27 & 28.  In addition, Mr. Kooistra sought and received two subpoenas duces tecum for cell phone records relative to Ms. Weston's cell phone, Mr. Ford's occupational supervisor's cell phone, and Ms. Weston's mother's phone so as to establish dates and a time line for various events relevant to the charges.  See CR Docket No. 34.  The district court granted the request for both subpoenas.  See CR Docket No. 35.

In anticipation of trial, Mr. Kooistra filed a motion seeking to exclude any evidence of other bad acts or other criminal convictions on Mr. Ford's part.  See CR Docket No. 46.  He also sought a pretrial ruling as to the admissibility of specific instances of sexual behavior by Ms. Weston.  Id.  Various other matters

were also the subject of motions *in limine* by Mr. Kooistra.  See CR Docket Nos. 50 & 56.

A pretrial conference was held on July 16, 2012, the morning of the trial. See CR Docket No. 86 (Pretrial Hearing Transcript).  At the conference, two prior tribal court arrests of Ms. Weston for assaulting Mr. Ford were discussed, one in April and one in May of 2011.  Id. at p. 12-13.  The arrests never resulted in convictions.  Id.  Instead, the charges were dismissed.  Id. Mr. Kooistra acknowledged the incidents did not represent convictions and he emphasized he was more interested in introducing evidence about the underlying incidents, not necessarily the arrests.  Id. at 14.  When pressed, however, Mr. Kooistra indicated he wanted to introduce into evidence the fact Ms. Weston was arrested twice for assaulting Mr. Ford.  Id.

The court indicated it was reserving its ruling on the admissibility of evidence of the two underlying incidents themselves.  Id. at 16.  However, the court ruled evidence that Ms. Weston had twice been *arrested* for assaulting Mr. Ford would *not* be admissible.  Id.

**B.    The Trial**

The jury trial took place July 16-19, 2012.  The government's first witness was Eric Sherman, Ms. Weston's cousin, who had stayed overnight at her house on June 29, 2011.  See CR Docket No. 87 at pp. 26-51 (Jury Trial Transcript, "JTT").  Sherman testified that the night of June 29, he, Michelle Red Earth, Ms. Weston and Mr. Ford were all at the Weston home drinking alcohol.  Id. at pp. 35-36.  Sherman indicated he probably also smoked some

3

marijuana that night.  Id. at p. 36.  During the course of the evening, Sherman testified he saw Mr. Ford come up behind Ms. Weston while she was seated and attempt to massage her shoulders.  Id. at 36-38.  Ms. Weston shrugged it off, indicating his touch was unwelcome.  Id. at p. 38.

All four persons slept at the Weston house that evening.  Id.  Sherman and Red Earth awoke the next morning at 11 or 11:30 and had coffee in the kitchen and began preparing breakfast late in the morning.  Id. at pp. 38-40. Fifteen to twenty minutes after awaking, Sherman testified he heard some muffled commotion from Ms. Weston's bedroom.  Id. at p. 40.  Sherman went toward the bedroom to check out the source of the noise; before he got to the door, Mr. Ford stepped out of the room, closing the door behind him.  Id.

Sherman described Mr. Ford as appearing very upset.  Id. at p. 41.  He was attempting to retrieve a cigarette and fumbling with it.  Id.  Mr. Ford said to Sherman, "Your cousin is having a fit, an attack.  You better go check on her."  Id.  Sherman approached, knocked on the door, and entered.  Id.  He found Ms. Weston on the floor on her hands and knees, curled up and kind of rocking back and forth, sobbing.  Id.  Sherman described Ms. Weston as appearing upset and "roughed up," with red marks on her arms and a swollen face from crying.  Id. at pp. 41, 44.  Photographs of the marks on Ms. Weston's arms were introduced into evidence.  Id. at p. 44.  When Sherman asked Ms. Weston what was wrong, she just pointed toward the door and said, "that [explitive] Bob."  Id. at p. 42.  Sherman left the bedroom looking for Mr. Ford, but he had left the house at that point.  Id. at pp. 42-43.

Sherman called his father, the Community Health Representative for the tribe. Id. at p. 43. Sherman's father directed him to call 911, which Sherman then did. Id.

Michelle Red Earth then testified for the government. Id. at pp. 51-62. Red Earth also stated that she, Sherman, Ms. Weston and Mr. Ford drank alcohol at the Weston home the evening of June 29, 2011, and all four persons slept at the home that night. Id. at pp. 53-55. Red Earth awoke the next morning between 8 and 9 and left the house to purchase bacon and eggs. Id. at p. 55. Red Earth said Sherman awoke and had coffee with her. Id. at p. 56.

Red Earth testified she heard a cry "like a shattered soul" coming from Ms. Weston's bedroom. Id. She turned around and Sherman was already moving toward the bedroom. Id. When Red Earth reached the bedroom, she found Ms. Weston on the floor "in a heap, crying, trembling, broken." Id. at pp. 56-57. Ms. Weston stated "he did wrong." Id. at p. 57. While Sherman was calling 911, Ms. Weston told Red Earth that Mr. Ford had hurt her, repeating the phrase, "he did wrong." Id. Red Earth described Ms. Weston as having marks on her arms and legs that had not been present the night before. Id. at p. 58.

The government's third witness was Christina Weston. Id. at 62-102. She testified that she had previously had a relationship with Mr. Ford beginning in 2005 and they had a child together. Id. at p. 66. She testified that the relationship ended in 2008. Id. After the two were no longer dating, they had consensual sex after both had been drinking in April, 2011. Id. at

5

pp. 66-67.  After this, Mr. Ford wanted to resume their relationship, but Ms. Weston did not.  Id. at p. 67.  Sometime between April and June 29, 2011, Mr. Ford lost his place of residence and needed somewhere to stay.  Id. at pp. 67-68.  Ms. Weston allowed him to stay in a vacant room in her basement, giving him a certain amount of time to find his own residence.  Id. at p. 68.

During the period when Mr. Ford was staying at Ms. Weston's home in the spring of 2011, she testified she came home early one evening to find Mr. Ford asleep in her bedroom.  Id. at p. 71.  Ms. Weston became very upset, telling him he "didn't have any business [being] in there."  Id.  An argument ensued.  Id.  Ms. Weston testified during the period when Mr. Ford resided at her home, he never—not even once—slept in her bedroom and that they never—not even once—had consensual sex.  Id. at pp. 72-73.

Ms. Weston described the evening of June 29 similar to Red Earth and Sherman:  the four of them were at the Weston home drinking alcohol.  Id. at p. 73.  In addition, Ms. Weston testified she ingested marijuana and took an Ambien sleeping tablet that night.  Id. at pp. 74-75.

During the evening, Ms. Weston described Mr. Ford making a pass at her on approximately two occasions by touching her shoulders.  Id. at p. 76.  She testified she rebuffed these passes as unwanted.  Id.  The second time, she testified she told Mr. Ford to "keep [his expletive] hands off" her.  Id. at pp. 76-77.  Ms. Weston also testified she told Mr. Ford they were not in a relationship and that they were not going to be in a relationship.  Id. at p. 77.

6

Ms. Weston testified Mr. Ford went to bed first, then she, Red Earth and Sherman went to bed later, sometime after 11 p.m., perhaps between midnight and 1 a.m.  Id. at pp. 77-78.  Ms. Weston went to sleep alone in her own bedroom.  Id.  She testified she woke up between 7 and 9 a.m. the next morning to pain in her genital/bottom region and Mr. Ford scrambling to pull her bottoms up.  Id. at pp. 78-79, 81.  She became livid and hysterical, screaming at him and asking him what he was doing.  Id. at p. 79.

At this point, Ms. Weston testified she tried to leave her room.  Id. at p. 80.  She said Mr. Ford prevented her from leaving by putting his leg up, blocking the entryway.  Id.  Ms. Weston testified she began screaming for help. Id. at p. 81.  She testified Mr. Ford took her cell phone and his own too, preventing Ms. Weston from using either.  Id.  Ms. Weston testified Mr. Ford grabbed one of the phones and told her he was going to call somewhere for help and not to get him in trouble.  Id. at p. 83.  Ms. Weston testified she was unable to escape the room until Sherman entered it, approximately an hour later.  Id. at p. 84, 90.

Ms. Weston identified red marks on her arms and legs in photos that were taken at the subsequent hospital visit.  Id. at p. 87.  She testified she did not know how those marks got on her body, but that they had not been there the evening before.  Id.  She described hitting at Mr. Ford to try to escape the room and him hitting her and pushing her back to keep her in.  Id. at p. 92.

Stacy Kooistra, Mr. Ford's trial counsel, cross-examined Ms. Weston.  Id. at pp. 89-102.  He established inconsistencies.  For example, Ms. Weston

7

testified the events occurred between 7 and 9 a.m., while Sherman testified they occurred between 11 a.m. and noon.  Id. at pp. 89-90.  Also, Ms. Weston claimed she screamed for an hour prior to Sherman entering the room, which would have been 10 a.m.  Id. at p. 90.  Ms. Weston testified she had an alarm clock in her room during the events in question, but that she could not recall looking at it.  Id. at pp. 90-91.  Her prior testimony had been that there was no clock in the room.  Id.

Mr. Kooistra then questioned her regarding prior testimony that the red marks on her arms and legs were inflicted before she woke up, whereas at trial she testified she received the marks while trying to escape after the assault.  Id. at p. 92.  Mr. Kooistra also exposed inconsistent statements Ms. Weston made about how much alcohol she had consumed, telling the police and hospital staff right after the events that she drank six beers, but testifying at trial to drinking more.  Id. at p. 93.

Mr. Kooistra also cross-examined Ms. Weston regarding her statement that Sherman was living at her house on June 29, 2011.  Id.  Mr. Kooistra asked if Sherman had testified he was not living there then, whether he was lying.  Id.  Ms. Weston responded that Sherman lived at her house when he was in town, staying in the basement.  Id.

Mr. Kooistra extracted an admission from Ms. Weston that Mr. Ford moved into her house soon after she had consensual sex with him in April, 2011.  Id. at p. 94.  He also pointed out that Ms. Weston told police

8

immediately after the events that she woke up lying on her back, whereas her trial testimony was that she was lying prone and half off the bed.  Id. at p. 95.

Mr. Kooistra extracted an admission from Ms. Weston that she told police right after the events that Mr. Ford's alarm clock in the basement, two floors below her, woke her at 5 a.m. on June 30.  Id. at pp. 96-97.  Mr. Kooistra pointed out the inconsistency in that prior statement with her trial testimony that she was so sound asleep three hours later that Mr. Ford was able to move her body and pull her bottoms down and begin having sex with her without waking her.  Id.  Also, Mr. Kooistra pointed out that Ms. Weston told police immediately after the events that she awoke sometime between 1 a.m. and 5 a.m. on June 30 when Mr. Ford simply walked into her bedroom and said her name without doing anything more.  Id. at pp. 99-100.  Again, Mr. Kooistra pointed out the inconsistency between her trial testimony that Mr. Ford was able to later move her body and pull her bottoms down and begin having sex with her without waking her.  Id.

Mr. Kooistra asked Ms. Weston if she told medical personnel that Mr. Ford had penetrated her anus and her vagina.  Id. at p. 101.  She testified she could not remember what she had told medical personnel.  Id.  She testified that she believed Mr. Ford had, indeed, penetrated both orifices.  Id.

The government's next witness was Kandy Smith, a criminalist in the biology section of the South Dakota State Forensic Laboratory.  Id. at pp. 102-03.  Ms. Smith testified that DNA swabs from Ms. Weston's vagina and anus

revealed the presence of sperm not inconsistent with Mr. Ford's DNA.  Id. at pp. 103-112.

The government's next witness was Cindy Deutscher, a physician's assistant from the Flandreau Hospital and Clinic.  Id. at p. 114.  Ms. Deutscher was on duty at the emergency room on June 30, 2011, when Ms. Weston came in following the events of the morning.  Id. at p. 116.  Ms. Deutscher did a physical exam of Ms. Weston on June 30 and noted bruises on both her arms and both her legs.  Id. at p. 127.  Ms. Deutscher testified that the bruises were new bruises, not old.  Id. at p. 127-30; 137-38.   Ms. Deutscher also documented some swelling in the genital area.  Id. at p. 132.  Ms. Deutscher testified there was no tearing, bruising, bleeding, lacerations, abrasions, or redness in the genital or anal areas.  Id. at pp. 139-40.

Before further testimony took place, a hearing out of the presence of the jury was held where Mr. Kooistra asked Judge Schreier to revisit her decision about the admissibility of the prior tribal assault arrests of Ms. Weston.  See CR Docket No. 87-1 at pp. 6-9 (JTT Vol. II).[1]  He explained that Ms. Weston had been arrested on tribal charges of assaulting Mr. Ford in May, 2011.  Id.  And, although that arrest never resulted in a conviction, the charges were still pending as of June 30, 2011, the date of the events in question.  Id.

---

[1] Volume I and Volume II of the JTT are both filed together, the former at the court's Docket No. 87, and the latter at the court's Docket No. 87-1.  The page numbers of Volume I of the JTT are congruent with the page numbers of the court's Docket No. 87, i.e. page 47 of the JTT is also page 47 of Docket No. 87. However, the page numbers for Volume II of the JTT are not congruent.  Page one of the court's Docket No. 87-1 is page 144 of Volume II of the JTT.  All page citations in this opinion to Volume II of the JTT shall be to the page number of the court's Docket No. 87-1, not to the page number of Volume II of the JTT.

Mr. Kooistra explained that Mr. Ford was scheduled to testify against

Ms. Weston in court on those tribal charges the week following June 30, 2011.

Id.  Mr. Kooistra sought the court's permission to allow him to introduce

evidence of these facts to explain why Ms. Weston reacted as she did the

morning of June 30 when she became agitated.  Id.  When the government

objected, Mr. Kooistra emphasized that he was not seeking to admit

information about the tribal court arrest in order to prove the truth of the

matter asserted—i.e. that Ms. Weston did in fact assault Mr. Ford in May,

2011—but rather to explain Ms. Weston's emotional reaction on the morning of

June 30.  Id.  Mr. Kooistra wanted to introduce evidence to show the reason

Ms. Weston was upset was because Mr. Ford was going to testify against her in

a court proceeding in the imminent future.  Id.  The court agreed with

Mr. Kooistra and ruled that evidence as to Mr. Ford's imminent testimony

against Ms. Weston in the tribal arrest would be admissible.  Id. at pp. 9-10.

The government then called its next witness, FBI Special Agent Michael

Melcher.  Id. at p. 12.  Agent Melcher testified that he had interviewed Mr. Ford

on July 5, 2011, a few days after the events of June 30, 2011.  Id. at p. 14.

Agent Melcher related the details of that interview, including Mr. Ford's

statement that he and Ms. Weston had ingested alcohol and crushed pain pills

the night of June 29, that Mr. Ford went to bed around 10:30 p.m., and that he

woke to his alarm clock at approximately 5:00 a.m. on June 30.  Id. at pp. 18-

20.  Mr. Ford told Agent Melcher he went to Ms. Weston's bedroom to check on

her and found she had vomited and urinated on herself; he also stated he saw

11

broken glass on the floor in the main part of the house.  Id. at pp. 19-22.

Mr. Ford told Agent Melcher that he cleaned Ms. Weston up and dressed her in

clean clothes, then began massaging her back with a massage tool.  Id. at 20-

22.  He said Ms. Weston apologized for her behavior, thanked him, told

Mr. Ford she loved him.  Id. at pp. 21-23.  This then led to consensual, vaginal

sex.  Id. at pp. 22-24.  Mr. Ford adamantly denied having anally penetrated

Ms. Weston.  Id. at pp. 23-24.  He described Ms. Weston at this time as "pretty

sober."  Id. at pp. 25-26.

After the sex was over, Mr. Ford told Agent Melcher that Ms. Weston's

demeanor changed drastically like a light switch going off:  she became

hysterical, screamed, told him she wanted to telephone her mother.  Mr. Ford

was bewildered by the change in her behavior.  Id. at pp. 23-27.  He first tried

to calm her down, tried making a phone call to a mental health professional,

then decided to leave, passing Sherman as he left and telling Sherman his

cousin was having a fit and needed help.  Id. at pp. 24-27.  When Mr. Ford left

Ms. Weston's bedroom, he described her as crying and curled up in a ball on

the floor, uncommunicative.  Id. at p. 25.  After Agent Melcher's testimony, the

government rested its case.  Id. at p. 38.

Mr. Kooistra then moved for dismissal of both counts of the indictment.

Id. at p. 38.  In particular, Mr. Kooistra argued the government had failed to

prove that Ms. Weston was incapacitated at the time she and Mr. Ford had

sexual intercourse.  Id. at pp. 38-39.  In this regard, he pointed out that

Ms. Weston herself claimed to have awoken twice in the early morning hours

and around dawn on June 30, showing that she was not incapacitated.  Id.
Mr. Kooistra further argued that proof of a sexual assault was a necessary
predicate before the jury could find Mr. Ford guilty of kidnapping to prevent the
report of a sexual assault.  Id.  The court denied the motion.  Id. at pp. 39-40.

The defense then called Dr. Eric Kutscher, who has a Doctor of
Pharmacy degree.  Id. at p. 41.  He testified that the Ambien Ms. Weston took
before going to bed at 1:00 a.m. on June 30 would essentially have been all but
gone from her system by 7 to 9:00 a.m. the next morning because it would
have been metabolized and excreted.  Id. at p. 58.  Furthermore, Dr. Kutscher
testified that the amnesia events sometimes associated with Ambien usually
take place within 3 to 5 hours after ingesting the medicine.  Id. at p. 59.
Ms. Weston's testimony that she woke up twice in the night between 1 and
5:00 a.m. and that she recalled waking at these times led Dr. Kutscher to
believe she did not experience amnesia with regard to her ingestion of Ambien.
Id. at p. 58.  Dr. Kutscher testified Ms. Weston would have gradually become
more sober as the hours passed following the time she went to bed and quit
drinking and ingesting substances.

Next, Mr. Kooistra called Dr. Elizabeth Dimitrievich, an
obstetrical/gynecological physician.  Id. at p. 72.  Dr. Dimitrievich reviewed the
exam records created by Ms. Deutscher and Ms. Smith when Ms. Weston was
examined the day of the events in question.  Id. at p. 76.  Because of the
presence of semen on the cervical swab, Dr. Dimitrievich concluded Mr. Ford
had ejaculated inside Ms. Weston's vagina.  Id. at pp. 80-82.  However, the

13

presence of Mr. Ford's semen on the anal swab could have been because semen from the vagina drained onto the exterior of the anus.  Id. at pp. 82-84. Therefore, Dr. Dimitrievich testified that the presence of Mr. Ford's semen on the anal swab did not necessarily show that Mr. Ford's penis had entered Ms. Weston's anus.  Id. at pp. 83-84.  Other ways an anal swab could test positive for semen other than vaginal drainage or penile penetration was if a finger contaminated with semen were inserted into the anus.  Id.

Dr. Dimitrievich also testified that Ms. Weston described on June 30, 2011, approximately 5 to 6 hours after the events in question, pain in her rectum at a level of 10 on a scale of 1 to 10, meaning that the pain she was experiencing in her rectum was the worst possible pain imaginable.  Id. at pp. 88-89.  Dr. Dimitrievich described the genital swelling found during Ms. Weston's exam to be not a very significant finding in light of Ms. Weston's description of the events and her description of her pain.  Id. at p. 90.

Finally, Mr. Ford testified.  Id. at p. 98.  Mr. Ford described knowing Ms. Weston since 1990, and beginning a dating relationship with her in January, 2005, that lasted until December, 2008, and resulted in the birth of their son in 2006.  Id. at pp. 99-101.  After the two broke up, they saw each other on again and off again.  Mr. Ford described having frequent contact with Ms. Weston in 2010 and having sex with her on two occasions in that year.  Id. at p. 101.  After this interlude, Ms. Weston reunited with her old boyfriend and the contact with Mr. Ford ceased.  Id. at p. 102.

Then, in 2011, Mr. Ford said Ms. Weston broke up with her boyfriend again.  Id.  From January to April, 2011, Mr. Ford testified the two had sex together on three occasions.  Id.  After the sexual encounter in April, 2011, the two started seeing each other a lot more according to Mr. Ford.  Id. at p. 103. Mr. Ford testified that the two of them got back together again as boyfriend and girlfriend and he moved into Ms. Weston's house at this time.  Id. at pp. 103-04.  Mr. Ford testified when he did so, he slept in Ms. Weston's bed with her every night.  Id. at p. 104.

On the night of June 29, 2011, Mr. Ford described drinking with Red Earth, Sherman, and Ms. Weston at Ms. Weston's home.  Id. at p. 109-10.  He went to bed in Ms. Weston's bedroom at approximately 10:30 p.m. because he had to get up and go to work in the morning.  Id. at pp. 110-11.  After about 20 minutes, however, he moved to a different bedroom in the basement because the three people who were still awake were making too much noise.  Id. at pp. 139-40.

When Mr. Ford awoke the next morning after his alarm went off at approximately 6:00 a.m., he saw Red Earth sleeping on the couch in the living room and Sherman and Ms. Weston sleeping on the floor.  Id. at pp. 112-13. In the kitchen, Mr. Ford testified there was broken glass on the floor.  Id. at p. 113.

Mr. Ford tried to wake up Ms. Weston, but she shrugged him off.  Id. at pp. 112-14.  Mr. Ford went out on the back porch and called into work to excuse himself, then went back to bed.  Id. at pp. 114-15.  At approximately

15

8:30 a.m. he awoke again.  Id. at p. 115.  He went back into the living room
and woke Ms. Weston up, noticing that she had vomited.  Id. at pp. 114-15.
He got Ms. Weston into the bathroom and brought her a warm washrag while
she undressed.  Id. at p. 115.  He brought her clean clothes from the bedroom.
Id.  Then he went back into the living room and cleaned up the vomit.  Id. at
p. 116.

Mr. Ford then joined Ms. Weston in their bedroom and the two visited
and shared a cigarette.  Id. at p. 117.  Mr. Ford went to the kitchen and got a
glass of water for Ms. Weston, noting along the way that Sherman had moved
from the floor to the couch.  Id.  Back in the bedroom, Ms. Weston complained
of her back hurting and Mr. Ford asked if she wanted a back rub.  Id. at
pp. 117-18.  She indicated she did.  Id. at p. 118.  Mr. Ford testified that she
herself removed her clothing and he began rubbing her back.  Id.   At this
point, Ms. Weston went to sleep.  Id. at p. 119.  After calling his boss again and
having another cigarette, Mr. Ford went back to bed and fell asleep again also.
Id.

According to Mr. Ford, the two woke up again around 10:30 a.m.  Id.  He
testified Ms. Weston began touching him and this led to them having
consensual sex.  Id. at pp. 120-23.  After the sex, the two of them started to get
dressed and were talking about mundane details of the day.  Id. at p. 123.
Mr. Ford then said they were going to have to figure something out come court
time for Ms. Weston.  Id.  Mr. Ford explained that Ms. Weston had assaulted

him a couple of weeks prior to June 30, 2011, and he was scheduled to testify against her in court. Id. at pp. 123-24.

Instead of responding to the statement Mr. Ford made about his imminent court testimony, he stated Ms. Weston accused him of "doing something to her that some guy did to her when she was eight years old." Id. at p. 124. Mr. Ford tried talking to her, asking what was going on, but he did not get any answers. Id. Ms. Weston screamed at Mr. Ford that she was going to ruin his life. Id. at pp. 140-41. He placed a call to 411 to the medical clinic in Flandreau, then, after Ms. Weston began asking for her mom, Mr. Ford called Ms. Weston's mother at 11:42 a.m. Id. at 124.

Mr. Ford testified that Ms. Weston's behavior frustrated and confused him, so he decided to leave. Id. at p. 127. When he left the bedroom, Ms. Weston was curled up in the corner by the closet. Id. He testified he never confined her to the bedroom or held onto her. Id. He never grabbed her or barricaded himself in front of the door. Id. at p. 128. Mr. Ford testified he never bruised Ms. Weston and that the bruises she had on her arms and legs had been there for approximately 7-10 days. Id. He testified there was no contact between them which would have caused bruising. Id. at p. 129. He also testified he never deprived Ms. Weston of her cell phone. Id.

At the conclusion of the trial, Mr. Ford was acquitted of the sexual abuse charge, but convicted of the kidnapping charge. See CR Docket No. 70.

## C.  Sentencing and Appeals

The district court sentenced Mr. Ford on October 29, 2012, to 36 months' imprisonment followed by two years of supervised release.  See CR Docket No. 90.

Mr. Ford timely appealed his conviction and sentence to the Eighth Circuit.  He raised four arguments:  (1) his acquittal on the sexual abuse charge required an acquittal on the kidnapping charge as a matter of law; (2) the district court erred in issuing two supplemental jury instructions; (3) the district court erred in denying his motion for judgment of acquittal; and (4) the district court erred in denying his motion for a new trial.  See United States v. Ford, 726 F.3d 1028, 1029 (8th Cir. 2013).  The Eighth Circuit affirmed in all respects.  Id. at 1036.  Mr. Ford timely petitioned the United States Supreme Court for a writ of certiorari.  That petition was denied on October 6, 2014.  Ford v. United States, ___ U.S. ___, 135 S. Ct. 131 (Oct. 6, 2014).  This timely § 2255 motion was filed on October 1, 2015.  See Docket No. 1.

## DISCUSSION

## A.  Scope of a § 2255 Motion

Section 2255 of Title 28 of the United States Code was enacted to supersede habeas corpus practice for federal prisoners.  Davis v. United States, 417 U.S. 333, 343-44 (1974).  Prior to the enactment of § 2255, habeas claims had to be brought in the district where the prisoner was confined, resulting in overburdening those districts where federal correctional institutions were

18

located and presented logistical issues because the record in the underlying criminal case were often in a distant location.  United States v. Hayman, 342 U.S. 205, 212-16 (1952).  The enactment of § 2255 resolved these issues by requiring that the motion be filed in the sentencing court.  Id.

The scope of a § 2255 motion is seemingly broader than the scope of a habeas petition, the latter of which is typically limited to allegations of a constitutional dimension.  Section 2255 allows a federal prisoner to "vacate, set aside or correct" a federal sentence on the ground that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  See 28 U.S.C. § 2255.  Where the allegation for relief is *not* based on a violation of a Constitutional or federal statutory right or an assertion that the court was without jurisdiction, the Supreme Court has read a "fundamentality" requirement into § 2255–relief is available for only those errors which constitute a "fundamental defect which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure."  Hill v. United States, 368 U.S. 424, 428 (1962); see Peguero v. United States, 526 U.S. 23, 27-30 (1999).  Mr. Ford's § 2255 motion is premised on an asserted violation of his Sixth Amendment right to effective assistance of counsel.

19

**B.      Sixth Amendment Right to Effective Assistance of Counsel**

**1.      Strickland**

The Sixth Amendment of the Constitution of the United States affords a criminal defendant with the right to assistance of counsel.  The Supreme Court "has recognized that 'the right to counsel is the right to effective assistance of counsel.' " Strickland v. Washington, 466 U.S. 668, 698 (1984) (citing McMann v. Richardson, 397 U.S. 759, 771, n.14 (1970)).  Strickland is the benchmark case for determining if counsel's assistance was so defective as to violate a criminal defendant's Sixth Amendment rights and require reversal of a conviction.  Id. at 687.  "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-688.  The defendant must also show that counsel's unreasonable errors or deficiencies prejudiced the defense and affected the judgment. Id. at 691.  The defendant must show "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. In sum, a defendant must satisfy the following two-prong test:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id. at 687.

"There is a presumption that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment."  Hall v. Luebbers, 296 F.3d 685, 692 (8th Cir. 2002).  It is the petitioner's burden to overcome this presumption, and a "petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test."  Id.  Judicial scrutiny of attorney performance is highly deferential, with a strong presumption that counsel's conduct falls within the range of reasonable professional conduct.  Strickland, 466 U.S. at 698.

Mr. Ford's claim of ineffective assistance of counsel stems from his allegation that Mr. Kooistra failed to timely and thoroughly investigate Ms. Weston and that failure then led to a failure to thoroughly cross-examine her at trial.  Mr. Ford alleges had Mr. Kooistra fully and timely investigated Ms. Weston, he would have uncovered evidence of her "history of exaggerations, lies, and false allegations," that she had been "involved in various court proceedings as both the accused and the accuser," and that she "was the defendant in a case where Mr. Ford was the victim of an assault."  See Docket No. 5 at p. 4.  Mr. Ford states, erroneously, that the evidence in support of the kidnapping charge came exclusively from Ms. Weston.  See Docket No. 5, at p. 3 ("Ms. Weston's testimony alone formed the basis for the kidnapping conviction.").

The court notes that Ms. Weston had bruising on her arms and legs on June 30, 2011, when she reported to the medical staff for her rape examination.  Those bruises were documented through photographs introduced into evidence.  Four persons testified that those bruises were fresh injuries rather than old bruises:  Ms. Weston, Sherman, Red Earth, and Cindy Deutscher.  Furthermore, as the government pointed out in closing argument, the jury could use its own common sense to conclude the bruises were new since the photographs depicted red and black marks on Ms. Weston's limbs, not the yellow or green marks that would indicate older injuries.  Also, Sherman and Red Earth testified to hearing a commotion coming from Ms. Weston's bedroom the morning of June 30, 2011, which would have been consistent with a struggle occurring therein.

Since Ms. Weston's own testimony was that she had been sexually assaulted while she was passed out or asleep, the inference is that she did not struggle during sex.  Therefore, the origin of fresh bruises on Ms. Weston's arms and legs and the noise of a struggle in the bedroom presumably came from the struggles she described during her confinement which formed the basis of the kidnapping charge.  Thus, Ms. Weston's testimony was not the sole evidence supporting the kidnapping charge.  The evidence of bruising and commotion, emanating from several sources of evidence, also supported the kidnapping charge.  With this information in mind, the court turns to an analysis of Mr. Ford's claim.

## 2.     Failure to Investigate

Mr. Ford alleges the following litigation history regarding Ms. Weston should have been discovered by Mr. Kooistra prior to Ford's trial and used in cross-examining her:

- A Dec. 14, 2010, protective order in favor of Nathan Sunderland and against Ms. Weston;

- A Jan. 24, 2005, tribal restraining order in favor of Erika Allen and against Ms. Weston;

- A Feb. 14, 2011, SD state court conviction for entering property after notice;

- A Mar. 24, 2009, SD state court conviction for DUI;

- A Mar. 5, 2008, SD state court conviction for disorderly conduct;

- A Nov. 6, 2006, SD state court conviction for DUI;

- An Apr. 26, 2005, SD state court conviction for NSF check;

- A Mar. 21, 2005, SD state court conviction for NSF check;

- A Dec. 3, 2002, SD state court conviction for reckless driving; and

- A May 20, 1996, SD state court conviction for NSF check.

See Docket No. 5 at pp. 7-8.  Mr. Ford alleges Mr. Kooistra was ineffective for failing to discover these court matters and for failing to then use the information to cross-examine Ms. Weston about them.  Furthermore, Ms. Weston was arrested on tribal simple assault charges involving Mr. Ford not once but twice in the months leading up to the June 29-30, 2011, events. Ms. Weston was arrested by tribal law enforcement on April 30, 2011, for simple assault domestic violence against Mr. Ford and again on May 15, 2011.

23

<u>See</u> Docket No. 5-4 at p. 1.[2]  These tribal charges were all dismissed, probably

because Mr. Ford did not want to take action on them.  <u>Id.</u>

Mr. Ford focuses his argument for his motion primarily on the deficient-performance prong of the <u>Strickland</u> analysis, arguing Mr. Kooistra did not investigate sufficiently to discover this pertinent information and that his failure to investigate fell below prevailing attorney conduct standards.  As to the prejudice prong of <u>Strickland</u>, Mr. Ford gives short shrift, simply asserting over and over that Ms. Weston's testimony was the only evidence against Mr. Ford in support of the kidnapping charge.

As noted above, that is simply not correct.  Ms. Weston had documented bruises of her arms and legs, bruises she testified she received at Mr. Ford's hands.  <u>See</u> Docket No. 87 at p. 97:22-25.  The bruises were documented with photographs.  <u>Id.</u> at pp. 128:13-25, 129:1-16.  Three other witnesses supported Ms. Weston's testimony that the bruises were newly-inflicted.  Sherman and Red Earth testified Ms. Weston did not have the bruises before retiring to bed in the early morning hours of June 30, 2011, but that they observed the bruises when they entered Ms. Weston's bedroom after hearing a commotion.  <u>Id.</u> at pp. 44:3-24, 58:12-22.  Cynthia Deutscher, a physician's assistant, testified that the bruises appeared new, not old, to her when she examined Ms. Weston on June 30, 2011.  <u>Id.</u> at pp. 129:22-25, 130:1-5; 137:15-25; 138:1-2.

---

[2] Mr. Ford asserts there were three tribal arrests of Ms. Weston for assaulting him, but the third arrest (on April 30, 2011), was for possession of less than one ounce of marijuana, not for assault.  <u>See</u> Docket No. 5-4 at p. 1.

The jury instruction on kidnapping given at Mr. Ford's trial and approved on appeal by the Eighth Circuit, provided as follows:

> For you to find Robert Ford guilty of Count 2 of the indictment, the prosecution must prove the following four essential elements beyond a reasonable doubt:
>
> *One*, Robert Ford unlawfully seized or confined Christina Weston without her consent;
>
> *Two*, Robert Ford held Christina Weston for the purpose of preventing her from reporting a sexual attack;
>
> *Three and four*, that Christina Weston is an Indian; and that the offense took place in Indian Country, namely at Flandreau, in Indian Country, in the District of South Dakota.

See Ford, 726 F.3d at 1030.

In response to jury questions, the district court issued two supplemental jury instructions, also approved by the Eighth Circuit. The first supplemental instruction told the jury it need not find Mr. Ford guilty on count 1 (sexual abuse) in order to find him guilty of count 2 (kidnapping). The second supplemental instruction expounded on the meaning of the phrase "unlawfully seized or confined without her consent" in the kidnapping instruction:

> The victim's lack of consent is a fundamental element of kidnapping. Kidnapping implies an unlawful physical or mental restraint or detention for an appreciable period of time against the person's will and with a willful intent to confine or detain the victim.

Id. at 1030-31. As the Eighth Circuit held, it was not necessary for a sexual attack to have occurred in order for Mr. Ford to be guilty of kidnapping. It was only necessary that he confined Ms. Weston against her will for the purpose of preventing her from *making a report* of a sexual attack. Id. at 1031-33.

It is against this law that the facts from the trial are measured to assess whether Mr. Ford was prejudiced by trial counsel's failure to introduce, or attempt to introduce (more about that below), the various protective order and misdemeanor criminal court proceedings.  Essentially, the information Mr. Ford now proffers would tend to cast Ms. Weston in an unfavorable light, as one who assaults and threatens others and who has had frequent entanglements with the law.  The proffer does not necessarily paint Ms. Weston as untruthful.  However, even assuming the jury would find such evidence relevant and indicative of Ms. Weston's veracity, nonetheless, the bruises were objective, verifiable evidence of some violence between Ms. Weston and Mr. Ford.

Even if the jury discounted Ms. Weston's testimony as untruthful, the jury would still have had to take into account the photographs of the bruises and the testimony of Red Earth, Sherman, and Deutscher, all of whom supported the finding that the bruises had been inflicted on Ms. Weston sometime between 1 a.m and 11:30 a.m. on June 30, 2011.  Add to this the circumstantial evidence that a commotion was heard coming from the bedroom by Red Earth and Sherman, that Mr. Ford himself was upset when he left the bedroom, and that all concerned—Mr. Ford included—described Ms. Weston as upset.

Finally, even Mr. Ford's own trial testimony circumstantially supported the kidnapping charge.  Ms. Weston had previously testified that when Mr. Ford confined her to her bedroom, he took her cell phone from her.  <u>See</u>

26

Docket No. 87 at p. 81:18-22.  When Mr. Ford testified, he said he telephoned Ms. Weston's mother at Ms. Weston's request.  <u>See</u> Docket No. 87-1 at pp. 124:24-25; 125:1-5.  Mr. Ford's cell phone billing statement was introduced to prove he in fact made a phone call to Ms. Weston's mother using his own phone.  <u>Id.</u> at pp. 125:5-25; 126:1-25; 127:1-10.  As the prosecutor asked on cross-examination, why was it necessary for him to telephone her mother if Ms. Weston could freely leave the room and could freely use her own telephone?  <u>Id.</u> at p. 145:10-18.  Evidence that Ms. Weston was a troubled person with an unreliable reputation for truthfulness would not have negated this proof adduced by both Mr. Ford and the government at trial.

The court concludes that, even if the jury found Ms. Weston to be untruthful, Mr. Ford would almost certainly still have been convicted of kidnapping.  However, there are additional reasons for holding Mr. Ford has failed to demonstrate <u>Strickland</u> prejudice:  most, if not all, of the information Mr. Ford faults Mr. Kooistra for failing to discover would not have been admissible at trial.

Rule 609 of the Federal Rules of Evidence provides as follows:

(a) The following rules apply to attacking a witness's character for truthfulness by evidence of a criminal conviction:

(1)  for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year; the evidence:
(A)  must be admitted, subject to Rule 403, in a civil case or in a criminal case in which the witness is not a defendant; and
(B)  must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that

27

>           defendant; and
>           (2)  for any crime regardless of the punishment, the evidence
>           must be admitted if the court can readily determine
>           that establishing the elements of the crime required
>           proving—or the witness's admitting—a dishonest act or false
>           statement.

See FED. R. EVID. 609(a).  If a conviction is older than 10 years, it cannot be

used for impeachment unless its probative value, supported by specific facts

and circumstances, substantially outweighs its prejudicial effect and advance

written notice is given of the intent to use the conviction.  See FED. R. EVID.

609(b).

     Ms. Weston's DUI, entering property after notice, disorderly conduct, and

reckless driving convictions would not have been admissible under Rule 609.

Not one of these convictions was a felony conviction punishable by more than a

year's imprisonment (all are misdemeanors), and none even arguably involve

dishonesty or false statement as an element of the offense.  See Docket

No. 22-1.  Had Mr. Kooistra discovered these offenses, it would have been of

little avail since the convictions would not have been admissible.  Mr. Ford

admits as much in his reply to his motion.  See Docket No. 26 at p. 8

("Admittedly, some of the [sic] Weston's criminal convictions may not meet the

criteria for impeachment under Fed. R. Evid. 609").

     The question of the admissibility of the NSF check convictions is not as

clear.  All three convictions were for misdemeanors, and the 1996 conviction

was more than 10 years old at the time of Mr. Ford's 2012 jury trial.  See

Docket No. 22-1.  Thus, if they would have been admissible at all, it could only

have been because dishonesty or false statement was a necessary element of the offense.  See FED. R. EVID. 609(a).

Applying the state court corollary to Rule 609, the South Dakota Supreme Court approved of the admission for impeachment of a defendant's five-year-old *forgery* convictions in State v. King, 346 N.W.2d 750, 751 (S.D. 1984), but did not explicitly hold that dishonesty was an element of the forgery convictions.  This court notes that forgery is typically a felony offense, and King's convictions were less than 10 years old, so the court's approval could have hinged solely on the fact that the convictions were felonies less than 10 years old.  In pleadings filed herein Mr. Ford never asserts or attempts to argue that issuing an NSF check is a crime of dishonesty admissible under Rule 609.  The court concludes that Mr. Ford is abandoning any such argument.  He has failed to support his showing of prejudice by demonstrating that the NSF convictions would have been admissible under Rule 609.[3]

Mr. Ford argues that Ms. Weston was *arrested* twice on tribal charges for assaulting him, once on April 30, 2011, and another time on May 12, 2011. Mr. Ford alleges Mr. Kooistra discovered only the second arrest, which Mr. Ford alleges was deficient on his part.  This is clearly wrong.  Mr. Kooistra discussed *both* tribal assault arrests at the pretrial conference.  See CR Docket No. 86 at pp. 12-14.  He clearly discovered and knew about both arrests.  At trial, Mr. Kooistra introduced evidence that Ms. Weston was facing charges in

---

[3] In any case, it is hard to fathom how evidence that Ms. Weston wrote some bad checks six years before the kidnapping trial would have proven that she was lying about being confined by Mr. Ford against her will.

tribal court for assaulting Mr. Ford and that Mr. Ford's expected testimony on those charges was imminent.  <u>See</u> Docket No. 87-1 at pp. 123:16; 123-25; 124:1-3.

Lastly, the court turns to Mr. Ford's argument that Mr. Kooistra was deficient for failing to discover evidence concerning a protective order issued in favor of Nathan Sunderland and a second protective order issued in favor of Erika Allen.  Although these are not criminal convictions, Mr. Ford argues that evidence of these court proceedings may have been admissible under Rule 607 and Rule 608.  At the very least, Mr. Ford argues that had Mr. Kooistra investigated these two matters, he could have identified further witnesses and documents that could have been used for impeachment.

These matters are not what Mr. Ford represents them to be.  The protective order involving Nathan Sunderland was a joint restraining order that ran against *both* Mr. Sunderland *and* Ms. Weston.  <u>See</u> Docket No. 5-13 at pp. 2 and 7.  Both parties were ordered by the court to have no contact with each other.  <u>Id.</u> at p. 7.  Apparently the order was issued based upon a stipulation by both parties that each of them had thrown items at one another. <u>Id.</u> at p. 2.  Knowledge of this mutual restraining order would not have helped Mr. Kooistra destroy Ms. Weston's credibility at trial.

The protective order in favor of Erika Allen indicates Ms. Weston never appeared at the hearing, either personally, or through counsel.  <u>See</u> Docket No. 5-14.  This protective order, then, appears to have issued on a default basis.

30

Even if admissible, this evidence would not have allowed Mr. Kooistra to damage Ms. Weston's credibility at trial.

Mr. Ford argues in his reply brief that Ms. Weston had previously falsely accused her ex-husband of kidnapping and that this information would have been "extremely helpful and persuasive to the jury since Mr. Ford was the subject of the same allegation." See Docket No. 26 at p. 10. The implication of Mr. Ford's statement is that Ms. Weston was responsible in the past for bringing false criminal charges of kidnapping against her ex-husband. The court agrees if this had been the case, it would have been relevant to Mr. Ford's trial. However, examination of the source documents Mr. Ford has placed in the record shows that Ms. Weston's prior allegations of kidnapping were something quite different.

Ms. Allen (aka Erika Dewald-Hoss), submitted an unsworn letter for use in these proceedings. In that letter, she states she and Ms. Weston's ex-husband, Lee Hoss, have custody of Ms. Weston's children. See Docket No. 5-12 at p. 1. Ms. Allen then states that Ms. Weston "continues to manipulate the community members around her, saying that we kidnapped the children and are holding them against their will, which is a falsehood." Id. In other words, Ms. Allen accuses Ms. Weston (in an unsworn letter) of spreading false gossip in the community. The court is not aware of, and Mr. Ford does not supply, any legal authority that would suggest the alleged victim of a violent crime can be impeached on the basis that she spreads false gossip.

31

It is true Mr. Kooistra says in his affidavit submitted in this matter that he would have welcomed additional impeaching information about Ms. Weston. See Docket No. 16 at p. 7, ¶ 30.  However, the evidence Mr. Ford unearthed and proffers herein is largely inadmissible at trial and, if admissible, would not have altered the outcome of the trial.  Mr. Kooistra carried out his investigation in this matter well above the standard of performance required by the Sixth Amendment.  He sought and obtained court permission to hire an investigator. Id. at pp. 1-2, ¶¶ 3-8.  The investigator he hired had a favorable reputation and expertise in finding information and witnesses in Indian Country.  Id. Mr. Kooistra met with the investigator numerous times over many hours and told the investigator to obtain all criminal history and public filings regarding Ms. Weston.  Id. at pp. 3-4, ¶¶ 14-17.  Mr. Kooistra scheduled joint meetings with the investigator, himself, and Mr. Ford so that the investigator would have all relevant information to proceed with.  Id. at pp. 3-4, ¶ 17.

Additionally, Mr. Kooistra made a strategic decision to undermine Ms. Weston's credibility with science.  Id. at p. 2, ¶¶ 9-10.  To that end, he sought and obtained permission to hire two experts to demonstrate that Ms. Weston could not have gotten more inebriated between 1 a.m. and 11 a.m., but instead would have gotten progressively more sober during that time frame. Id. at p. 2, ¶ 10.  Also, he showed through experts that the DNA evidence could be as consistent with consensual sex as with rape.  Id.  at p. 3, ¶ 11.  In addition, Mr. Kooistra obtained phone records to attempt to corroborate Mr. Ford's testimony of the timeline of events, but those records did not

substantiate Mr. Ford's version of events.  Id. at p. 4, ¶¶ 18-19.  The one phone record that did corroborate Mr. Ford's version of events (the phone call to Ms. Weston's mother) was introduced into evidence as discussed above.

It is Mr. Ford's burden under Strickland to show prejudice.  In order to do so, he must show "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Strickland, 466 U.S. at 695.  The court finds that Mr. Kooistra's failure to find out about Ms. Weston's other court proceedings, civil and criminal alike, did not prejudice Mr. Ford at trial because such evidence would not have caused the jury to have a reasonable doubt respecting his guilt on the kidnapping charge.

### 3.    Failure to Effectively Cross-Examine

The two issues raised by Mr. Ford—failure to investigate and failure to effectively cross-examine—are melded into a single issue:  what should Mr. Kooistra have discovered in his investigation and what use could he have made of it at trial if he had?  That issue, particularly the potential prejudice from failing to discover the information proffered by Mr. Ford, is discussed above.  Herein, the court discusses further law regarding ineffective assistance of counsel stemming from cross-examination of a witness at trial.

In Johnson v. United States, 278 F.3d 839, 843 (8th Cir. 2002), Johnson alleged his trial counsel was ineffective for failing to vigorously cross-examine an eye witness with her prior inconsistent statements about having seen a gun.  Although the witness had consistently stated she saw a gun, the location and circumstances were different in her various pretrial statements, and different

from her trial testimony.  Id.  The Eighth Circuit held failure to cross-examine the witness about her previous statements did not rise to the level of a Strickland violation because the discrepancies in the witness's testimony were small and the result of the jury verdict would not have been different if defense counsel had vigorously cross-examined the witness.  Id.

In Hall v. Luebbers, the Eighth Circuit held that none of the following actions by defense counsel constituted a Strickland violation:  counsel's failure to introduce evidence showing that a critical witness was motivated to lie; counsel's failure to impeach a witness with a prior inconsistent statement; and counsel's failure to cross-examine witness with information gained from her medical records.  Hall had been convicted in Missouri state court of murder and was sentenced to death.  Hall, 296 F.3d at 689-91.  Hall claimed his trial counsel was ineffective in the guilt phase of his trial for failure to adequately cross-examine three government witnesses, his wife Donna, his friend Kim, and Charles Ingram.  Id. at 692.  The court determined counsel's actions conformed with sound trial strategy and that the impact of such evidence would have been minimal and non-prejudicial to the petitioner.  Id. at 693-98.

As to Donna, trial counsel cross-examined her about her anger toward Hall for having an affair with another woman, Loveless.  Id. at 693.  He also called Donna and Hall's son, John, who testified his mother hated Loveless and that the affair may have motived her to testify against Hall.  Id.  Donna admitted on cross-examination she was angry with Hall over the affair, but denied that motivated her to testify against Hall.  Id.  Hall argued his lawyer

34

should also have called Loveless as a witness, should have introduced notes
and evidence on Donna's motive to lie because of the affair, should have
introduced Donna's medical records, should have obtained forensic testing of
Hall's car, and should have impeached Donna with her own inconsistent
statements.  Id.  The court held that trial counsel's decisions were strategic.
Id.  In any event, the court wrote, the evidence that was not introduced was
merely cumulative of the evidence counsel did introduce and would have had
only minimal impact.  Id.

Charles Ingram testified at trial to having seen Hall in the vicinity of the
murder at 10:30 a.m.  Id. at 696.  Hall's own testimony placed him at the scene
of the murder; his theory of defense was self-defense and accident.  Id. at 689-
92.  Ingram had earlier told police that he saw Hall near the store at 11:45 a.m.
Id. at 696.  Trial counsel did not cross-examine Ingram with his prior
inconsistent statement as to time.  Id.  The court held this was not prejudicial;
Ingram's testimony was not necessary to place Hall at the scene of the crime
because Hall himself admitted to being present.  Id.  Furthermore, although
trial counsel apparently failed to see the connection between Ingram's
testimony and evidence of premeditation (i.e. that Hall was at the scene earlier
scoping things out), it was merely cumulative of testimony from another
witness, Slater, who also placed Hall in the vicinity of the crime at 10:30 a.m.
Id.

Finally, Hall claimed trial counsel should have impeached his friend,
Kim, by calling a cell-mate of Kim's who would have testified Kim said he could

get out of his prison sentence by testifying against Hall.  Id.  The court held this was not prejudicial because trial counsel damaged Kim's credibility by showing that Kim had received a $1,000 reward for cooperating with police and he stood to gain leniency on his sentence in return for his testimony.  Id.

In contrast to Hall and Johnson, in Steinkuehler v. Meschner, 176 F.3d 441, 444-45 (8th Cir. 1999), the Eighth Circuit held that trial counsel's performance was deficient when he failed to cross-examine a sheriff as to evidence that he pressured another witness (a jailer supervisor) to "forget" petitioner's intoxicated state.  The court also held counsel's performance was deficient when he failed to cross-examine the sheriff about allegations that he himself often "forgot" facts favorable to criminal defendants.  Id.  Because petitioner's defense to the murder was his intoxication, the testimony of law enforcement personnel who saw petitioner directly after the shooting was critical to his defense.  Id. at 445.

Only two witnesses testified as to petitioner's condition, the sheriff and the jailer supervisor, and their testimony was in direct conflict.  Id.  The court concluded that counsel's deficient performance in failing to attack the credibility of the sheriff prejudiced the petitioner and denied him a fair trial.  Id.  Petitioner faced a first-degree murder conviction unless he could convince the jury that he was intoxicated at the time of the shooting.  Id.  Cross-examining the sheriff would likely have produced evidence that would have led the jurors to have a reasonable doubt as to petitioner's guilt.  Id.  Thus, the court concluded that "a reasonable probability exists that the result of

36

petitioner's first-degree murder conviction would have been different if trial counsel would have [cross-examined the sheriff]." Id. at 446.

Here, applying the above law to Mr. Kooistra's cross-examination of Ms. Weston at trial, the court concludes Mr. Kooistra was not deficient and Mr. Ford has failed to demonstrate prejudice.  Mr. Kooistra did vigorously cross-examine Ms. Weston.  He pointed out multiple inconsistencies in her story and times when she changed her story.  He introduced expert testimony to show Ms. Weston's assertion that she awoke twice in the night with little provocation (a door opening, an alarm clock going off two floors below her), was inconsistent with her claim that Mr. Ford began sexually assaulting her many hours later without her awaking.  He persisted, despite the district court's early adverse ruling, in getting evidence before the jury of Ms. Weston's prior arrests for assaulting Mr. Ford, thereby showing she had a motive to lie.  Finally, contrary to Mr. Ford's repeated assertions, Ms. Weston's testimony was not the only evidence in support of his kidnapping conviction.  As discussed previously, there were multiple witnesses who relayed multiple facts (including Mr. Ford himself) that supplied evidence in support of the kidnapping conviction.  Again, these were the appearance of new bruises on the morning of June 30, the noise of a commotion from the bedroom, and the fact that Mr. Ford had to place the call to Ms. Weston's mother rather than placing the call herself.  As with the failure-to-investigate claim, the court concludes that Mr. Ford has failed to demonstrate prejudice as to his failure-to-cross-examine claim.

## C.    No Evidentiary Hearing is Warranted

A § 2255 motion can be denied without holding an evidentiary hearing if (1) the movant's allegations, even if true, would not entitle him to relief; or (2) the movant's allegations cannot be taken as true because they are contradicted by the record, they are inherently incredible, or they are conclusions rather than factual statements.  Hyles v. United States, 754 F.3d 530, 534 (8th Cir. 2014).  "If [the court] can determine from the motion and the supporting record in the case that [the movant] is not entitled to § 2255 relief, then no hearing was, or is now, required."  Saunders v. United States, 236 F.3d 950, 952 (8th Cir. 2001).

Here, the court concludes that no evidentiary hearing is warranted. Even assuming Mr. Kooistra was deficient in failing to find the information about Ms. Weston's other court proceedings and use it at the trial to cross-examine her, Mr. Ford has failed to demonstrate prejudice.  There is no issue of fact or credibility to be determined by holding an evidentiary hearing. Therefore, the court recommends no such hearing be held.

## CONCLUSION

Based on the foregoing facts, law and analysis, this magistrate judge respectfully recommends that the government's motion to dismiss [Docket No. 22] be granted and that Robert Ford's motion to vacate, set aside, or correct [Docket No. 1] be denied.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED August 18, 2016.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge